**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

KAREN ROEBUCK                                                                    PLAINTIFF

v.                                    **Case No. 4:18-cv-00092 KGB**

USABLE LIFE                                                                     DEFENDANT

<u>**OPINION AND ORDER**</u>

This is an action filed under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), by plaintiff Karen Roebuck (Dkt. No. 1). Defendant USAble Life ("USAble") filed an answer to Ms. Roebuck's complaint (Dkt. No. 6), and the parties submitted an administrative record (Dkt. No. 12). Ms. Roebuck then filed a motion for summary judgment (Dkt. No. 15). USAble responded, and Ms. Roebuck replied (Dkt. Nos. 18, 19).

Although Ms. Roebuck's motion is styled as one for summary judgment, she does not cite Federal Rule of Civil Procedure 56 in either her motion or brief in support (Dkt. Nos. 15, 16). Furthermore, USAble's response asks the Court to affirm USAble's disability benefits determination (Dkt. No. 18, at 15). Accordingly, the Court treats Ms. Roebuck's motion for summary judgment as a motion for judgment on the administrative record.

Having considered the parties' respective positions regarding Ms. Roebuck's entitlement to disability benefits, the Court finds that Ms. Roebuck's claim should be dismissed with prejudice (Dkt. Nos. 15, 18, 19). The relief requested by Ms. Roebuck is denied.

I.      **Background**

A.      **The Policy**

USAble issued a long-term disability insurance policy (the "Policy") to Arkansas Blue Cross and Blue Shield (Dkt. No. 12-10, at 108). The Policy states that, if a policyholder

"become[s] disabled while insured under the policy, we will pay long term disability insurance benefits after you satisfy the elimination period." (*Id.*, at 140). The Policy contains a clause that authorizes USAble to "have the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the policy." (*Id.*, at 131).

The Policy defines "disabled" as satisfying the "Occupation Test,"[1] which is defined as follows:

Occupation Test

1.    During the elimination period [sic] the first 24 months and of a period of disability, an injury, sickness, or pregnancy requires that you be under the regular care of a physician, and prevents you from performing all of the material duties of your regular occupation with reasonable accommodations; and

2.    After 24 months of disability, an injury, sickness, or pregnancy prevents you from performing all of the material duties of any gainful occupation with reasonable accommodations for which your education, training, and experience qualifies you.

(*Id.*, at 122). The effective date of the Policy is January 1, 2011, the renewal date is January 1, 2012, and the "anniversary date" of the Policy is "January 1, 2011[,] and [e]ach [s]ucceeding January 1." (*Id.*, at 108, 110). The Policy defines the "elimination period" as 180 days (*Id.*, at 121).

### B.    Ms. Roebuck's Initial Claim

Ms. Roebuck worked as a registered nurse who evaluated insurance claims for Blue Cross Blue Shield from October 2012 until December 28, 2015 (Dkt. No. 12-9, at 6-7). Ms. Roebuck was involved in a motor-vehicle collision on December 21, 2013 (Dkt. No. 12-6, at 19). At the

---

[1] Ms. Roebuck concedes that the "Elimination Test," an alternative way to define "disability" under the Policy, does not apply in this litigation.

hospital following the accident, Ms. Roebuck complained of neck pain, lower back pain, and soreness in her chest (*Id.*). She received treatment as a result of her injuries (*Id.*).

Although Ms. Roebuck initially continued to work after the 2013 accident, eventually, she quit working. Ms. Roebuck's last day of work was December 23, 2015, and she filed an application for long-term disability income benefits under her employer's long-term disability plan, which is issued by USAble, on June 29, 2016 (Dkt. Nos. 12-9, at 7-9; 12-11, at 102). In her application, she cited her symptoms as "low back pain, neck/[left] arm and shoulder pain, bilateral wrist pain/numbness . . . ." (Dkt. Nos. 12-9 at 6; 12-11, at 111).

The administrative record includes medical evidence, including but not limited to the following. On February 3, 2014, Ms. Roebuck had an MRI performed on her lumbar spine (Dkt. No. 12-10, at 87). This procedure revealed the following:

> At L4-L5, there is small central disc protrusion. In conjunction with facet overgrowth and ligamentum flavum thickening, this results in mild spinal canal narrowing. The disc protrusion measures 4 mm anterior to posterior. Spinal canal is narrowed to a minimum dimension of 11 x 14 mm. There is some crowding of the nerve roots but no high grade effacement of the thecal sac. These changes result in mild narrowing of subarticular recesses bilaterally, but no high-grace impingement of the descending nerve roots identified. The neural foramina are patent.

(*Id.*).

Another MRI was performed on Ms. Roebuck on February 3, 2014, this time on her cervical spine. This MRI revealed the following:

> L paracentral disc extrusion C5-6 resulting in mild spinal canal narrowing and contacts and flattens the anterior L aspect of the spinal cord. No signal abnormalities. Mild L neural foraminal encroachment. L Paracentral disc protrusion C6-7 without sig stenosis. Mild L neural foraminal encroachment.

(Dkt. No. 12-1, at 189).

On January 15, 2015, Dr. Kenneth Rosenzweig performed a "lumbar facet joint inflection-fluoroscopic guided" procedure on Ms. Roebuck (Dkt. No. 12-3, at 13). On January 29, 2015, he performed a "[r]adiofrequency denervation" procedure on Ms. Roebuck (*Id*., at 11). On February 12, 2015, he performed another "radiofrequency denervation" on Ms. Roebuck (*Id*., at 9). On June 18, 2015, he performed a "[f]luoroscopically guided SI joint injection, right and left" on her (*Id*., at 7). He performed another "[f]luoroscopic SI joint injection, left and right" on her on September 10, 2015 (*Id*., at 5).

On October 1, 2015, Ms. Roebuck had another cervical spine MRI performed (Dkt. No. 12-11, at 31). This MRI revealed the following:

> At C2-C3 and C3-C4, no significant disc bulge or herniation or evidence for neural compromise is seen.

> At C4-C5, a minimal central focal disc bulge present with no evidence for neural compromise.

> At C5-C6, there is a mild to moderate left paracentral disc herniation which extends minimally into the left foramen with very mild cord flattening to the left [of] the midline and mild left foraminal stenosis.

> At C6-C7, there is a mild posterior disc protrusion with left paracentral predominance extending slightly into the left foramen and with extrusion and subligamentous inferior extension below the disc level in the left paracentral/central distribution approximately three fourths of the height of the C7 vertebral body. There is mild to moderate left foraminal stenosis without significant central canal stenosis. A free disc fragment cannot be excluded.

> At C7-T1, there is no significant disc bulge or herniation or evidence for neural compromise.

(*Id*.).

Ms. Roebuck underwent a breast reduction surgery on December 28, 2015 (Dkt. No. 12-8, at 278-79). She contends this procedure was done to relieve her chronic pain complaints. After

the surgery, Ms. Roebuck "continued to report lumbar spine pain, which was exacerbated by sitting." (Dkt. No. 12-1, at 9).

On June 24, 2016, Dr. Carlos Roman examined Ms. Roebuck (Dkt. No. 12-2, at 117-18). Dr. Roman's final diagnosis of Ms. Roebuck included the following: (1) Left wrist pain; (2) "[s]tatus post TFCC repair"; (3) cervical radiculopathy; (4) cervical disc disease; (5) lumbar spondylosis; (6) cervical spondylosis; (7) low back pain; and (8) long-term use of an opioid agent (*Id.*, at 118).

The stipulated record also contains medical records for Ms. Roebuck from a family doctor, Dr. Charles Himmler. On January 26, 2016, Dr. Himmler assessed Ms. Roebuck with "[r]ight-sided low back pain with right-sided sciatica" and "[c]oronary artery disease involving native coronary artery of native heart . . . ." (Dkt. No. 12-10, at 52). Dr. Himmler examined Ms. Roebuck again on February 1, 2016, and March 21, 2016 (*Id.*, at 54-59). On June 20, 2016, as relevant here, Dr. Himmler assessed her as having "[l]umbar disc disease" and "[c]ervical disc disease with myelopathy," but he also noted that she was "[m]alingering" because she "[w]ouldn't extend her knees but walked in, around & out of the office just fine at a normal pace." (Dkt. No. 12-11, at 65). On July 8, 2016, Dr. Himmler signed an "attending physician's statement of functionality" where he stated that Ms. Roebuck's diagnoses were "spondylosis and post laminectomy syndrome" and "TFCC tear [left] wrist." (*Id.*, at 73). In this statement, Dr. Himmler stated that Ms. Roebuck should be restricted to 20-30 minutes of sitting for 2 hours total daily, 10 minutes standing and walking with 10-30 minutes of standing a day and 30-40 minutes of walking a day (*Id.*, at 74). He further stated that she is "[u]nable to stay in one position without moving" and that she "can lift/carry up to 10# occasionally with bilateral but never with the left." (*Id.*).

USAble initially approved Ms. Roebuck's disability claim under a reservation of rights (Dkt. No. 12-1, at 8). Amy Smith, a registered nurse and "Medical Consultant," reviewed Ms. Roebuck's medical history and issued a report on September 8, 2016 (Dkt. No. 12-9, at 264-68). Ms. Smith concluded that Ms. Roebuck's impairment was caused by "[c]ervical and lumbar spine multilevel degenerative disease and disc protrusions causing chronic neck and low back pain. Also left wrist pain with documented weakness and decreased range of motion." (*Id*., at 267).

As to whether Dr. Himmler's restrictions were supported by the medical data, Ms. Smith provided the following conclusions:

> The claimant has had consistent ongoing back pain reports for at least two years, for which she has received treatment with injections, medications, and physical therapy without improvement. There are some abnormal findings on MRI. Examinations findings are inconsistent among providers ranging from normal to decreased range of motion.
>
> . . .
>
> The claimant has reported consistent left wrist pain since at least October 2015. She underwent surgical repair of a TFCC tear at that time without symptom improvement. Exam findings reveal weakness of the left wrist as well as decreased range of motion with flinchings.
>
> . . .
>
> Based on the above medical data, it is evidence that the claimant has had chronic back pain since at least 2014 for which she has received numerous treatments without improvement. She has abnormal diagnostic findings; however examination findings are inconsistent among providers. It is unclear if the claimant's left wrist pain and abnormal exam findings would preclude her from sustained sedentary activities. The [restrictions]/[limitations] of two hours of sitting, thirty minutes of standing and 45 minutes of walking, appear overly restrictive, however it is unclear if the claimant is capable of sustained sedentary level activities.

(*Id*., at 267-68). Ms. Smith ultimately recommended that a functional capacity evaluation ("FCE") be conducted on Ms. Roebuck (*Id*., at 268). Dr. Himmler signed off on the FCE (*Id*., at 222).

Nancy Gilpatrick, a vocational rehabilitation counselor, provided comment on the physical demands of Ms. Roebuck's occupation (*Id*., at 275). She concluded that Ms. Roebuck's occupation as a nurse case manager "is performed at a SEDENTARY level of physical demand," and Ms. Gilpatrick described sedentary work as involving "sitting most of the time, but may involve walking or standing for brief periods of time." (*Id*.).

An FCE for Ms. Roebuck was conducted on November 7, 2016 (*Id*., at 228). The FCE was performed by Laura Calgaro, a physical therapist (*Id*.). Ms. Calgaro also concluded that Ms. Roebuck's work position fell into "the Sedentary range." (*Id*., at 229). The FCE lasted three and a half hours, and Ms. Calgaro concluded that "the client is able to tolerate the Sedentary level of work for the 8-hour/40-hour week." (*Id*.). Ms. Calgaro noted that Ms. Roebuck complained of "pain in the back and right knee" and "[p]ain in [the] whole spine from neck down to back" and that her "pain statements were consistent with the observed movement patterns." (*Id*., at 230).

On November 14, 2018, USAble sent a letter to Ms. Roebuck informing her that they could not "provide disability benefits beyond 11/14/2016." (*Id*., at 221). In the letter, USAble stated that it received Ms. Roebuck's application for long-term disability benefits and that "[m]edical records from Kenneth Rozenweig MD, Charles Himmler MD, and Juan Roman MD, were requested and reviewed by an RN medical consultant." (*Id*., at 222). USAble further noted that Ms. Roebuck had "some abnormal diagnostic findings; however, examination findings are inconsistent among providers and indications in your office visits noted you were malingering regarding your claimed function capacity." (*Id*.).

USAble explained that Ms. Smith determined that an FCE would be necessary and that Dr. Himmler signed off on the FCE (*Id*.). USAble then cited the results of the FCE, including that Ms. Roebuck's occupation as a nurse case manager is performed at the sedentary physical demand

level and that the FCE concluded that Ms. Roebuck "could perform the physical requirements of a sedentary occupation for an 8 hour work day." (*Id.*). In its letter, USAble concluded that, since "the results indicate you have the physical capacity to perform your own occupation as a Nurse Case Manager," USAble "cannot provide you additional benefits . . . ." (*Id.*).

### C. Ms. Roebuck's Appeal

On May 12, 2017, USAble received Ms. Roebuck's request for an appeal review (Dkt. No. 12-1, at 8). Ms. Roebuck attached to her letter of appeal "a disc that contains nearly 1,300 pages of medical records documenting the onset of Ms. Roebuck's conditions . . . [and] the treatment for her various conditions . . . ." (*Id.*). Dr. Seana Daly provided an attending physician's statement, dated June 16, 2017, to USAble (Dkt. No. 12-2, at 103-04). Dr. Daly noted in this statement that Ms. Roebuck's current diagnosis is "osteoarthritis" and "CAD." (*Id.*, at 103). On the form, in response to a question about the level of work Ms. Roebuck could perform, Dr. Daly selected "Sedentary Activity," which includes the explanation: "10 lbs. maximum lifting or carrying articles. Walking/standing on occasion. Sitting 6 to 8 hours." (*Id.*, at 104). Based on the record, Dr. Daly may have indicated that Ms. Roebuck was capable of this activity for 4 hours per day; that is not clear (*Id.*). Dr. Daly also checked "Never" in response to the following question: "[W]ill patient recover sufficiently to perform the duties of his/her [own occupation or any occupation]." (*Id.*).

Dr. Daly also examined Ms. Roebuck on July 25, 2017 (Dkt. No. 12-1, at 228). Ms. Roebuck's chief complaint was "PT not working for bilat[eral] knee pain" and that she wanted "to discuss getting an MRI." (*Id.*). Dr. Daly concluded that Ms. Roebuck suffered from bilateral knee pain, bilateral hand numbness, obesity, and gastroesophageal reflux disease (*Id.*, at 230).

Dr. John Pierpont conducted a "Nerve Conduction Velocities/Electromyography Study" on Ms. Roebuck on August 10, 2017 (*Id.*, at 256). Ms. Roebuck also saw Dr. Kimberly Tucker on August 22, 2017 (*Id.*, at 225). Dr. Tucker concluded that Ms. Roebuck indicated "severe osteoarthritis of her knees . . . ." (*Id.*, at 226). Dr. Tucker provided Ms. Roebuck with a knee injection and recommended weight loss as well as a return to physical therapy once Ms. Roebuck's symptoms improved (*Id.*).

Ms. Roebuck was assessed by Karen Cross, a nurse practitioner, on September 7, 2017 (*Id.*, at 199-203). Ms. Cross concluded that Ms. Roebuck had "[c]ervical spinal stenosis" and that "she may have a chronic radiculopathy . . . ." (*Id.*, at 202). Dr. John Anthony Lee reviewed Ms. Roebuck's cervical MRI and concluded that Ms. Roebuck had "moderate left-sided canal stenosis at C6-7" that "could affect the left C7 nerve root." (*Id.*, at 201). Ms. Roebuck was also examined by Dr. Timothy Putty on October 17, 2017, and he concluded that "her EMG was consistent with a radiculopathy of some sort" and that "[t]he MRI findings do corroborate this." (*Id.*, at 207). A lumbar MRI was conducted on Ms. Roebuck on October 25, 2017 (*Id.*, at 32-33). The reviewing physician, Dr. Boyd Ashdown, noted the following: (1) no central or foraminal compromise at L1-2, though there was an "8mm indeterminate lesion within the L1 vertebral body"; (2) mild facet arthropathy without central or foraminal compromise at L2-3; (3) mild canal narrowing at L3-4; (4) annular degeneration with shallow central protrusion and mild canal stenosis at L4-5; and no central or foraminal compromise at L5-S (*Id.*, at 33).

USAble then obtained a medical review from a medical consultant: registered nurse Stephanie Benwell. Ms. Benwell considered Ms. Roebuck's medical records that were submitted before the appeal, as well as the newly submitted information from Ms. Roebuck (*Id.*, at 189-94). Specifically, Ms. Benwell reviewed the following documents: the two MRIs that were taken on

February 3, 2014; the cervical spine MRI taken on October 1, 2015; the May 17, 2015, sleep study; the May 19, 2017 bilateral knee x-ray; the August 10, 2017, nerve conduction EMG; the September 18, 2017, cervical spine x-ray; and the September 18, 2017, cervical spine MRI (*Id.*, at 189). Ms. Benwell also reviewed the medical procedures that Ms. Roebuck experienced since 2015, and she reviewed the reports of Dr. Himmler, Dr. Daly, Dr. Tucker, Dr. Putty, and nurse practitioner Ms. Cross (*Id.*). Ms. Benwell's report provides a timeline of Ms. Roebuck's medical procedures and assessments, as well as a short description of each medical record that she reviewed (*Id.*, at 189-90).

Ms. Benwell also conducted a telephone call with Ms. Roebuck, where Ms. Roebuck reported that she had difficulty completing daily tasks and that she "has pain constantly but sometimes it's a strong shooting pain." (*Id.*, at 191). Ms. Benwell further noted that Ms. Roebuck, among other symptoms, "reports weight gain, memory prob[lems], inability to drive and drowsiness r/t meds," and Ms. Roebuck reports "using motorized cart for shopping and needs assist, no housework." (*Id.*).

Ms. Benwell also noted Dr. Himmler's diagnosis of "spondylosis and post laminectomy syndrome" with a work restriction of "20-30 min sit for 2 hours total daily . . . ." (*Id.*). Ms. Benwell also recounted Dr. Daly's diagnosis of "[osteoarthritis] and coronary artery disease" with a work limitation of "no prolonged stand[ing], no heavy lifting" and a "4 hrs sedentary level activity" restriction (*Id.*).

In her analysis of Ms. Roebuck's medical records, Ms. Benwell stated that she agreed with Ms. Smith's prior review and noted that the vocational expert determined Ms. Roebuck's occupation to be sedentary (*Id.*, at 192). Ms. Benwell noted that, following the FCE, Ms. Roebuck "has gained 20 pounds" and is "deconditioned per her most recent course of physical therapy . . .

." (*Id.*).  Ms. Benwell further noted that Ms. Roebuck "reported pain throughout PT but was noted to be tolerant of more exercise as she progressed" and that Ms. Roebuck "self-discharged on 8/8/17 indicating she wanted to pursue other treatment." (*Id.*).

Ms. Benwell also discussed Dr. Tucker's conclusion that Ms. Roebuck suffers from severe osteoarthritis; Ms. Benwell stated that this conclusion "is inconsistent with the x-ray provided by Dr. Daly on 5/19/17 showing only mild right knee degenerative findings." (*Id.*).  Ms. Benwell further pointed out that Dr. Tucker advised Ms. Roebuck "to undergo weight loss and return to PT" and that "[t]here is no indication she returned to PT and her weight per additional medical records has only increased." (*Id.*).  Ms. Benwell also observed that Dr. Tucker "has not provided support out of work or restrictions and limitations to date." (*Id.*).

Ms. Benwell additionally discussed the examination by Ms. Cross and Dr. Putty, noting that Dr. Putty stated that Ms. Roebuck's "EMG was suspicious for cervical radiculopathy" and that "Dr. Putty has not provided support out of work or restrictions and limitations to date." (*Id.*).  Ms. Benwell also noted that Ms. Cross observed that Ms. Roebuck's "gait was . . . normal." (*Id.*).

Ms. Benwell concluded that "the exam findings and diagnostics are inconsistent among providers" and that the medical records did not "clearly support a significant decline since the FCE." (*Id.*, at 193).  Ms. Benwell offered the following assessment regarding Ms. Roebuck's ability to sustain full-time work capacity:

> Unclear, it has been almost a year since the claimant's FCE.  Her diagnostics are largely unchanged from the cervical spine perspective.  The lumbar MRI is pending.  The claimant is noted to be deconditioned and has gained a significant amount of weight since testing which could impact her function currently.  There is no indication at this time that as of 11/7/16 the claimant was not able to perform sustained sedentary activity as the FCE was valid.

(*Id.*).

Based upon the FCE, Ms. Roebuck's medical records, and Ms. Benwell's review, on December 5, 2017, USAble informed Ms. Roebuck *via* letter that "our original decision to deny [Ms. Roebuck's] claim for benefits was appropriate." (*Id.*, at 6). In this letter, USAble noted that Ms. Roebuck's long-term disability policy states that Ms. Roebuck must demonstrate a disability "[d]uring the elimination period and the first 24 months of a period of disability . . . ." (*Id.*). USAble also noted that the policy defines the "Elimination Period" as "180 days." (*Id.*, at 7). USAble stated in the letter that it "reconsidered all of the information previously submitted, as well as new documentation and re-evaluated your client's claim in its totality, including all applicable policy provisions and previous conclusions reached." (*Id.*, at 9).

In the letter, USAble discussed at length Ms. Benwell's report (*Id.*, at 9-11). USAble acknowledged Ms. Roebuck's "ongoing cervical, wrist, bilateral knee and lumbar pain" and the impact on her work functions (*Id.*, at 11). USAble incorporated Ms. Benwell's finding that Ms. Roebuck "demonstrated sustained sedentary level activity for 8 hours a day/40 hours per week," but USAble also noted in the letter that Ms. Roebuck "was unable to safely perform climb, kneel and overhead reach on an occasional or consistent level." (*Id.*, at 9-10). USAble referenced Ms. Benwell's determination that the FCE appeared to be valid (*Id.*). USAble also discussed Ms. Benwell's finding that Ms. Roebuck had "gained 20 pounds and is noted to be obese and deconditioned per her most recent course of physical therapy . . . ." (*Id.*, at 10). Further, USAble observed that Ms. Benwell reported that Ms. Roebuck reported pain throughout physical therapy but was "noted to be tolerant of more exercise as she progressed" and that Ms. Roebuck "self-discharged . . . to pursue other treatment." (*Id.*, at 10).

USAble's denial letter noted Ms. Benwell's finding that the September 18, 2017, cervical spine MRI was "largely unchanged" and that this is also true for Ms. Roebuck's October 25, 2017,

lumbar spine MRI (*Id*., at 10-11). USAble also acknowledged Dr. Daly's osteoarthritis and coronary artery disease diagnoses but pointed to Ms. Benwell's observation that there are no cardiac records that support the diagnosis of coronary artery disease (*Id*., at 11). USAble in its denial letter also noted that Dr. Daly's evaluation occurred six months after the FCE (*Id*.). Finally, USAble referenced Dr. Himmler's note regarding malingering (*Id*.).

In the denial letter, USAble stated that it was "assessing and evaluating [Ms. Roebuck's] functional capacity as of the time she ceased work, December 28, 2015[,] through the 180-day elimination period to June 25, 2016[,] as she must satisfy the 180-day elimination period before benefits begin." (*Id*.). Given that USAble's vocational consultant concluded that Ms. Roebuck's regular occupation "performed at a sedentary level of physical demand" and because Ms. Benwell concluded that the FCE was valid, USAble concluded that the record evidence did not support a claim for disability under the Policy (*Id*.).

## II.    Standard Of Review

The Court's function in ERISA cases is to conduct a review, using one of two standards. If the plan language does not give the insurer the discretion to determine eligibility for plan benefits or to construe the terms of the plan, the Court should conduct a *de novo* review of the administrative record. *Farley v Benefit Trust Life Ins. Co.*, 979 F.2d 653, 660 (8th Cir. 1992) (citing *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If, however, the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the Court applies the abuse of discretion standard. *Bruch*, 489 U.S. at 115. "[R]eview for an 'abuse of discretion' or for being 'arbitrary and capricious' is a distinction without a difference" as the terms are generally interchangeable. *Jackson v. Prudential*

*Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2008) (citation omitted). In either event, the Court's review is limited to a review of the record made before the administrator of the plan.

The Policy at issue includes a discretionary clause that authorizes USAble to exercise "sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the policy." (Dkt. No. 12-10, at 131). The Court concludes that this language, if enforceable, is sufficient to confer on USAble discretionary power to determine eligibility for benefits. Ms. Roebuck argues, however, for *de novo* review, making several arguments in support.

Ms. Roebuck argues for *de novo* review based upon Arkansas Department of Insurance Rule 101, which states:

> No policy, contract, certificate or agreement offered or issued in this State providing for disability income protection coverage may contain a provision purporting to reserve discretion to the insurer to interpret the terms of the contract, or to provide standards of interpretation or review that are inconsistent with the laws of this State.

Ark. Admin. Code 054.00.101-7 ("Rule 101"). Rule 101, however, only applies "to all disability income policies issued in this State which are issued or renewed on and after March 1, 2013." Ark. Admin. Code 054-00.101-7. Ms. Roebuck argues that "the policy was issued on January 1, 2011, but, by its own terms is renewable and renews on January 1, 2012." (Dkt. No. 16, at 13). Ms. Roebuck further argues that, because the Policy renews each year on January 1, it was renewed after March 1, 2013 (*Id.*).

On this point, the Court disagrees with Ms. Roebuck. Other district courts that have examined this issue have found that the anniversary date of a policy is not a "renewal" of that policy under Rule 101. *See Price v. Tyson Long-Term Disability Plan*, Case No. 5:16-cv-05075, 2017 WL 3567531, at *3-4 (W.D. Ark. Aug. 17, 2017) (holding that "the anniversary date of a policy is not a renewal within the meaning of Rule 101"); *Owens v. Liberty Life Assurance Co. of*

14

*Boston*, 184 F. Supp. 3d 580, 585 (W.D. Ky. 2016) (same); *Rogers v. Reliance Standard Life Ins. Co.*, 14 C 4029, 2015 WL 2148406 (N.D. Ill. May 6, 2015) (holding that "anniversary date" did not qualify as a "renewal" date under a similar Texas regulation). Here, the Policy's effective date was January 1, 2011 (Dkt. No. 12-10, at 110). The renewal date was January 1, 2012, and the Policy's anniversary date is "January 1, 2011[,] and [e]ach [s]ucceeding January 1." (*Id*., at 108, 110). The parties have not pointed the Court to any language in the Policy that indicates that the Policy renews every year on January 1. Accordingly, the Court declines to assume—without any basis in the record evidence—that the anniversary date is also a renewal date. Thus, the only renewal date in the record for the Policy is January 1, 2012 (*Id*., at 110). Because the Policy was issued and renewed prior to March 1, 2013, and was not renewed again after that date based on the record evidence before the Court, the Court finds that Rule 101 does not apply to the Policy.

Ms. Roebuck further argues that she is entitled to *de novo* review due to "procedural irregularities . . . which caused a serious breach of USAble's fiduciary duty to Roebuck." (Dkt. No. 16, at 13). Specifically, Ms. Roebuck argues that, because USAble was the insurer of her long-term disability plan, USAble has a conflict of interest (*Id*., at 15). Ms. Roebuck also argues that a procedural irregularity exists because: (1) USAble "relied upon the opinion of an in-house nurse" who asked for an FCE; (2) USAble relied upon an FCE performed by a physical therapist who "noted the obvious pain under which Roebuck performed . . . and then assumed that Roebuck could continue in that fashion . . . throughout a 40-hour week;" and (3) USAble relied upon Ms. Benwell's review in spite of the additional medical records provided by Ms. Roebuck (*Id*.).

Under *Woo v. Deluxe Corp*., 144 F.3d 1157, 1160-61 (8th Cir. 1998), and subsequent case law, a claimant is entitled to "a less deferential standard of review" when he or she shows "a palpable conflict of interest *or* a serious procedural irregularity . . . which . . . caused a serious

breach of the plan administrator's fiduciary duty . . . ." *Boyd v. ConAgra Foods, Inc.*, 879 F.3d 314, 320 (8th Cir. 2018) (quoting *Menz v. Proctor & Gamble Health Care Plan*, 520 F.3d 865, 871 (8th Cir. 2008) (emphasis in original)). The Eighth Circuit Court of Appeals has held that the mere existence of a conflict of interest is not enough to invoke the less deferential standard of review. *Boyd*, 879 F.3d at 320 (citing *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 115-17 (2008)). Furthermore, "[t]he mere presence of procedural irregularities . . . does not warrant the less deferential standard." *Hillery v. Metro. Life Ins. Co.*, 453 F.3d 1087, 1090 (8th Cir. 2006). The Eighth Circuit "has not definitely resolved the impact of *Glenn* on the *procedural irregularity* component" of the *Woo* test. *Boyd*, 879 F.3d at 320 (citing *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 830 n.3 (8th Cir. 2014)) (internal quote omitted) (emphasis in original).

It is true that the lack of a thorough investigation by a fiduciary can result in a serious procedural irregularity requiring a less deferential standard of review. *Woo*, 144 F.3d at 1161. In *Woo*, Hartford Life failed to obtain an independent medical review of the plaintiff's medical claim, and this was found to be a "serious procedural irregularity." *Id*. There, the plaintiff had an uncommon disease that was subsequently diagnosed by her treating physicians, though it was not properly diagnosed at the time she was eligible for benefits. *Id*. Under the circumstances, the *Woo* court held that Hartford Life had a duty to obtain an independent medical evaluation and investigate the treating physicians' diagnoses rather than simply rely on its in-house review of her earlier physicians' treatment notes. *Id*.

Even when the Court considers the alleged conflict of interest and the alleged procedural irregularities together, the Court concludes that Ms. Roebuck is not entitled to a *de novo* review. First, the Court finds that Ms. Roebuck is not entitled to a more deferential standard of review due to the alleged conflict of interest caused by USAble's status as both the insurer and decision maker

with respect to benefits eligibility. The Eighth Circuit "has consistently rejected the notion that the mere presence of a potential conflict of interest is sufficient to warrant a less deferential standard." *Cooper v. Metro. Life Ins.*, 862 F.3d 654, 660 (8th Cir. 2017). There is no record evidence indicating that USAble's decision to deny Ms. Roebuck benefits was motivated by its pecuniary interest as insurer. Accordingly, even considering this potential conflict of interest in conjunction with the alleged "serious procedural irregularities," the Court concludes that Ms. Roebuck has failed to show that a less deferential standard of review governs this case.

Second, Ms. Roebuck has failed to show that USAble committed "a serious procedural irregularity" by relying upon "in-house" nurse consultations and an FCE performed by a physical therapist. *Woo*, 144 F.3d at 1160. On January 26, 2016, prior to her application for disability benefits, Ms. Roebuck's treating physician, Dr. Himmler, diagnosed her with "[r]ight-sided low back pain with right-sided sciatica" and "[c]oronary artery disease involving native coronary artery of native heart," and on June 20, 2016, he assessed her as having "[l]umbar disc disease" and "[c]ervical disc disease with myelopathy . . . ." (Dkt. No. 12-10, at 52, 65). On June 24, 2016, Dr. Carlos Roman diagnosed Ms. Roebuck with the following: (1) Left wrist pain; (2) "[s]tatus post TFCC repair;" (3) cervical radiculopathy; (4) cervical disc disease; (5) lumbar spondylosis; (6) cervical spondylosis; (7) low back pain; and (8) long-term use of an opioid agent (Dkt. No. 12-2, at 118). These diagnoses were considered in USAble's initial denial of Ms. Roebuck's claim (Dkt. No. 12-9, at 222). Unlike in *Woo*, her post-application diagnoses are mostly unchanged from the diagnoses provided by Dr. Himmler and Dr. Roman: the only new diagnosis after USAble's initial denial appears to be Dr. Daly and Dr. Tucker's osteoarthritis diagnoses (Dkt. Nos. 12-1, at 226; 12-2, at 103-04). Otherwise, Ms. Roebuck's post-denial medical diagnoses were for coronary

artery disease, spinal stenosis, and radiculopathy (Dkt. Nos. 12-1, at 201-02, 207; 12-2, at 103-04).

Ms. Benwell's assessment considered these post-denial medical diagnoses, and she specifically noted that Dr. Tucker's osteoarthritis diagnosis "is inconsistent with the x-ray provided by Dr. Daly on 5/19/17 showing only mild right knee degenerative findings." (Dkt. No. 12-1, at 192). Ms. Benwell also noted that Dr. Tucker advised Ms. Roebuck "to undergo weight loss and return to PT" and that "[t]here is no indication she returned to PT and her weight per additional medical records has only increased." (*Id*.). Ms. Benwell further concluded that, because a year had passed since the FCE and her review and given Ms. Roebuck's weight gain and failure to complete physical therapy, there was "no indication . . . that as of 11/7/16 the claimant was not able to perform sustained sedentary activity . . . ." (*Id*., at 193). While Ms. Roebuck's osteoarthritis diagnosis occurred after the FCE, the record evidence shows that Ms. Benwell reviewed that diagnosis, noted discrepancies between Dr. Daly and Dr. Tucker's evaluations, and considered the possibility that the osteoarthritis arose after the FCE. USAble then considered and relied upon Ms. Benwell's analysis when it denied Ms. Roebuck's appeal (*Id*., at 10-11). The Court concludes that this case does not present the same kind of extenuating circumstances as found in *Woo*. USAble considered Ms. Roebuck's post-FCE examinations—which were conducted by her own medical providers—and there is no evidence that USAble misinterpreted or ignored those examinations. The Court concludes that Ms. Roebuck has failed to show that serious procedural irregularities caused USAble to breach its fiduciary duties to Ms. Roebuck.

For these reasons, the Court determines that the abuse of discretion standard applies to its review in this case. Under the abuse of discretion standard, the Court must affirm the plan administrator's interpretation of the plan unless it is arbitrary and capricious. *Midgett v. Wash.*

*Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 896-97 (8th Cir. 2009). "When a plan administrator offers a reasonable explanation for its decision, supported by substantial evidence, it should not be disturbed." *Ratliff v. Jefferson Pilot Fin. Ins. Co.*, 489 F.3d 343, 348 (8th Cir. 2007). Substantial evidence is "more than a scintilla but less than a preponderance." *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000). "The discretionary decision of a plan administrator is not unreasonable merely because a different, reasonable interpretation could have been made." *Ratliff*, 489 F.3d at 348. The Court may consider the quantity and quality of evidence before a plan administrator, and the Court should hesitate to interfere with the administration of an ERISA plan. *Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 875 (8th Cir. 2006). The review, however, "is not tantamount to rubber-stamping the result." *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005).

The Court will also consider the potential conflict of interest and the alleged procedural irregularities when determining if USAble abused its discretion in denying Ms. Roebuck's claim. *Boyd*, 879 F.3d at 320. The Eighth Circuit has advised that the weight afforded such factors depends upon the facts of the case. *Id*. Such facts that have increased that weight include:

> That the insurer's claims review process was tainted by bias; that the medical professionals who reviewed the claim for [disability] benefits were employed by the insurer, or that their compensation was tied to their findings; and that the insurer acted as little more than a rubberstamp for favorable medical opinions.

*Cooper*, 862 F.3d at 661 (citations omitted).

### III.    Claims Decision

The Court concludes that USAble did not abuse its discretion when it denied Ms. Roebuck's disability benefits under the Policy. Ms. Roebuck argues that USAble failed to obtain an appropriate medical review as is required by the Policy and ERISA regulations because it relied

upon the FCE and because USAble ignored her radiculopathy diagnosis (Dkt. Nos. 16, at 18-23; 18, at 2-7). USAble responds that its decision was reasonable, supported by substantial evidence, and did not ignore any of Ms. Roebuck's diagnoses or any language in the Policy (Dkt. No. 18).

First, Ms. Roebuck argues that USAble did not obtain an "independent medical evaluation" as required by 29 C.F.R. § 2560.506-1(h)(3) (Dkt. No. 16, at 18-20). The Court disagrees. The Eighth Circuit has held that "an FCE 'alone constitutes more than a scintilla of evidence' when the FCE concludes a benefits claimant does not meet an ERISA plan's 'disability' definition." *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1051 (8th Cir. 2011) (quoting *Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 888 (8th Cir. 2002)). The Eighth Circuit has also held that it is "proper" for a medical professional to base his or her conclusions in part on FCE results. *Green*, 645 F.3d at 1051.

Here, Ms. Calgaro conducted a three-and-a-half-hour examination of Ms. Roebuck and determined that Ms. Roebuck "is able to tolerate the Sedentary level of work for the 8-hour/40-hour week." (Dkt. No. 12-9, at 229). This FCE provides "objective clinical evidence" regarding how Ms. Roebuck's medical conditions affected her ability to work. *Green*, 646 F.3d at 1051. The fact that the FCE was performed by a physical therapist does not undermine the FCE. *See Jackson*, 303 F.3d at 887-88 (holding that MetLife's decision to deny benefits was supported by substantial evidence where an independent physical therapy clinic reviewed the claimant's physical capacity). Further, there is record evidence that Dr. Himmler signed off on the FCE (Dkt. No. 12-9, at 222).

In its initial denial, USAble referenced both the FCE results and Ms. Smith's review of Ms. Roebuck's medical history (*Id.*). Ms. Roebuck argues that Ms. Smith is an "in-house nurse" for USAble, but the record evidence only shows that she is a "Medical Consultant." (*Id.*, at 268). Even

if Ms. Smith was employed by USAble, there is no evidence that her compensation was tied to her findings. The record evidence is insufficient to support an argument that Ms. Smith was biased. The Court concludes that the FCE and Ms. Smith's review provide substantial evidence to support the finding that Ms. Roebuck was not "disabled" under the Policy.

To distinguish *Green* from the present case, Ms. Roebuck argues that USAble failed to obtain an independent medical opinion after she submitted additional medical records on appeal (Dkt. No. 16, at 19). The Court notes that, on appeal, Ms. Roebuck submitted the medical records and opinions of Dr. Daly, Dr. Pierpont, Dr. Putty, Dr. Tucker, Dr. Lee, Dr. Ashdown, and nurse practitioner Ms. Cross, each of whom assessed her following the FCE (Dkt. Nos. 12-1, at 199-203, 225, 226; 12-2, at 33, 103-04). On USAble's behalf, Ms. Benwell then reviewed the medical records from both before and after USAble's initial denial of disability benefits (Dkt. No. 12-1, at 189-94). Ms. Benwell acknowledged Dr. Tucker's osteoarthritis diagnosis, but she found that it was inconsistent with Dr. Daly's prior x-ray (*Id.*, at 192). She also stated that Ms. Roebuck's cervical MRI was "largely unchanged." (*Id.*). Ms. Benwell concluded that there was "no indication at this time" that the FCE was incorrect, though Ms. Benwell did note that since the FCE Ms. Roebuck had gained weight and that this could have impacted her ability to function (*Id.*, at 194). Thus, the Court finds that Ms. Benwell did review and evaluate Ms. Roebuck's additional medical records on appeal.

Ms. Roebuck next argues that Ms. Benwell is an "in-house nurse" and therefore not an "independent" medical professional, yet the record evidence only shows that Ms. Benwell is a "Senior Clinical Consultant." (*Id.*, at 194). There is no evidence in the record that Ms. Benwell is compensated based upon the outcome of her evaluation or that she is otherwise biased. Furthermore, ERISA does not require plan administrators to give special weight to the opinions of

21

treating physicians in disability determinations. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 824 (2003). The Court concludes that Ms. Benwell's review is additional substantial evidence to support USAble's decision that Ms. Roebuck was not "disabled" under the Policy.

Ms. Roebuck also argues that USAble "completely ignored [Ms.] Roebuck's diagnosis of radiculopathy" and that this failure "rendered USAble's denial unreasonable." (Dkt. No. 16, at 20). Ms. Roebuck argues that the Policy "necessarily considers documented radiculopathy a disability . . . ." (*Id.*, at 22). The Court disagrees with Ms. Roebuck's interpretation of the Policy on this point. To be entitled to benefits under the Policy, a claimant must be "disabled" under the Policy (Dkt. No. 12-10, at 122). Per the Policy, if a claimant is disabled, and if the disability is due to a "special condition," then the disability benefits are limited to a total of 24 months (*Id.*, at 145). The Policy specifically states that "radiculopathies, documented by electromyogram," are not "special conditions." (*Id.*, at 126-27). In the Court's view, this Policy language does not mean that a diagnosis of radiculopathy means that a claimant is *per se* "disabled" under the Policy; such an interpretation would render meaningless the Policy's definition of "disabled." Rather, the threshold determination under the Policy is whether a claimant is "disabled" as defined in the Policy; once the disability determination is made, then the "special condition" provision is implicated. Accordingly, the definition of "special condition" does not affect how this Court interprets "disabled" under the Policy.

Ms. Roebuck argues that Ms. Benwell failed to consider her diagnosis of radiculopathy. The record evidence, however, indicates that Ms. Benwell and USAble considered Ms. Roebuck's alleged radiculopathy. First, the Court notes the exact language used by Dr. Putty regarding Ms. Roebuck's alleged radiculopathy; Dr. Putty noted that "she may have a chronic radiculopathy" and that "her EMG was consistent with a radiculopathy of some sort." (Dkt. No. 12-1, at 202, 207).

Furthermore, Ms. Benwell specifically noted that Dr. Putty observed that Ms. Roebuck's EMG was "suspicious for cervical radiculopathy." (*Id.*, at 191). As Ms. Benwell did consider the alleged radiculopathy in her assessment, the Court finds that USAble did not commit error by relying on Ms. Benwell's assessment when determining whether Ms. Roebuck was not entitled to disability benefits under the Policy. Moreover, the record evidence also indicates that Dr. Roman assessed Ms. Roebuck for radiculopathy on June 24, 2016, *before* the FCE was conducted on November 7, 2016 (Dkt. No. 12-2, at 118). The FCE did not specifically account for radiculopathy, but the Court finds that it is reasonable to presume that any disability arising from radiculopathy would have been identified during the FCE, if such a disability existed. Accordingly, the Court concludes that USAble did not err when it relied upon Ms. Benwell's report to determine that Ms. Roebuck was not entitled to benefits under the Policy.

Finally, the Court acknowledges that the administrative record in this case reflects that a conflict of interest exists because USAble was both the administrator of the Policy and the insurer or payer of plan benefits. While this conflict of interest does not necessarily require the Court to apply a less deferential standard of review, the Court must consider this conflict as one factor among many when determining whether USAble abused its discretion. *Glenn*, 554 U.S. at 116-18. The significance of the conflict of interest depends on the circumstances of the particular case. *Id.* The conflict of interest factor is "more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision" and "less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id.* at 117.

Here, there is a conflict of interest, but the Court concludes that the circumstances suggest that the conflict of interest was reduced close to or to the vanishing point. While Ms. Roebuck

contends that Ms. Smith and Ms. Benwell should both be characterized as "in-house" nurses for USAble, there is no evidence that they were compensated based upon the outcome of their evaluations. Their assessments reflect consideration of the actual medical records submitted on behalf of Ms. Roebuck. The record evidence also indicates, and Ms. Roebuck does not contest, that the physical therapist who conducted the FCE—Ms. Calgaro—was an independent medical professional (Dkt. No. 12-9, at 228-34). Finally, USAble's explanation of its findings, in both the initial denial and the denial of Ms. Roebuck's appeal, included a thorough description of its findings, rather than acting as a "rubberstamp" for Ms. Smith and Ms. Benwell's findings (Dkt. Nos. 12-1, at 6-13; 12-9, at 221-223). After considering all factors, the Court finds that USAble has offered the Court "a reasonable explanation for its decision, supported by substantial evidence," and the Court will not disturb USAble's denial. *Ratliff*, 489 F.3d at 348.

## IV. Conclusion

Under the deferential standard of review accorded to a plan administrator's denial of benefits, the Court concludes that USAble's decision to deny Ms. Roebuck long-term disability benefits was reasonable because it was supported by substantial evidence. Accordingly, Ms. Roebuck's motion for summary judgment is denied, and the Court grants defendant USAble judgment on the record (Dkt. No. 15). Ms. Roebuck's complaint is dismissed with prejudice (Dkt. No. 1).

So ordered this the 30th day of March, 2019.

Kristine G. Baker
United States District Judge